UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DOCKET NO. 301CV295CFD

ARLEANA DUFFY, )
      PLAINTIFF )
v. )
 )
STATE OF CONNECTICUT, )
UNIVERSITY OF CONNECTICUT )
HEALTH CENTER & )
STATE OF CONNECTICUT )
DEPARTMENT OF CORRECTIONS, )   NOVEMBER 17, 2003
      DEFENDANTS )
_____ )

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Rule 56(a)(2) of the Local Rules of Civil Procedure, Arleana Duffy, Plaintiff, hereby files the following in support of her Opposition to the Defendants' Motion for Summary Judgment:

### Response to Defendants' Local Rule 56(a)(1) Statement

1.    Denied. Arleana Duffy ("Plaintiff") was employed by both University of Connecticut Health Center ("UCHC") and the Connecticut Department of Corrections ("DOC"). Plaintiff applied for a position as a dental assistant at the Osborn Correctional Institution ("OCI") during the summer of 1999. See Deposition of Arleana Duffy, dated February 14, 2002, hereinafter referred to as "Duffy Dep.," pp. 19-20, 22. During the application process, Plaintiff was interviewed by Pamela Shea and Dr. Michael Young. See Duffy Dep., pp. 20-21. Plaintiff's interview with Dr. Young was conducted at OCI in the presence of Pam Fairhurst. See Id. In addition, as part of her application for employment, Plaintiff was required to complete the University of Connecticut Health Center Application for Employment, the Department of Corrections Background Information Sheet and a Connecticut Department of Corrections Release of Information

1

Form. See Department of Corrections Background Information Sheet, dated July 23, 1999; Connecticut Department of Corrections Release of Information Form, dated July 23, 1999. The Department of Corrections Background Information Sheet requires the applicant to sign that she "understand[s] that any false, inaccurate misleading or incomplete answer may result in disciplinary action including termination from State service." See Department of Corrections Background Information Sheet, dated July 23, 1999. The Connecticut Department of Corrections Release of Information Form authorizes the DOC to obtain information from any source "referred to in the employment application process relating to whatever in the opinion of the Connecticut Department of Correction is relevant to [the applicant's] suitability for employment in the Connecticut Department of Correction." See Connecticut Department of Corrections Release of Information Form, dated July 23, 1999. On August 27, 1999, DOC and UCHC completed the C.O.L.L.E.C.T. Investigation Report on Plaintiff, noting that she had "met the Department of Corrections minimum standards for the position sought." See C.O.L.L.E.C.T. Investigation Report, dated August 27, 1999.

On September 7, 1999, Plaintiff received a letter confirming her acceptance of the position of Dental Assistant at OCI. See Letter of Employment, dated September 7, 1999. The letter informed Plaintiff that her employment would begin on September 10, 1999 and would be subject to successful completion of a six-week training program at the Maloney Center for Training and Staff Development, a DOC training facility. See Id; See also Notice of Department of Correction Training Program, dated September 24, 2003. On September 10, 1999, Plaintiff and Anna Lenczewski, the Human Resources Officer, completed a State of Connecticut Designation of Retirement System-Tier-Plan-Beneficiary Form, which listed "UConn Health Center/Corrections" as Plaintiff's employing agency. See State of Connecticut Designation of Retirement System-Tier-Plan-Beneficiary Form, signed and dated September 10, 1999. Also on September 10, 1999, Plaintiff was given a copy of the DOC Employee Handbook and required to sign a form acknowledging that she understood that she was responsible for reading and

2

understanding its contents and complying with its requirements. See Acknowledgment Form; DOC Employee Handbook. See also Infra ¶ 6.

2.      Denied. Although Plaintiff was employed at OCI at the times she received the letters from Dr. Young, she was not consecutively employed at OCI from her date of hire until Dr. Young's transfer. In September of 1999, Plaintiff began working as a dental assistant at OCI, a level four (out of five), high to medium security prison for male inmates. See Letter of Employment, dated September 7, 1999; Duffy Dep., p. 14; Deposition of Michael Young, dated February 5, 2002, hereinafter referred to as "Young Dep.," p. 21. However, on October 12, 1999, Plaintiff reported to the Department of Corrections Maloney Center for Training and Staff Development to attend a mandatory six-week training program required by the DOC. See Notice of Department of Correction Training Program, dated September 24, 2003; Duffy Dep., pp. 32-33; Addendum to Memorandum of Understanding between DOC and UCHC, p. 4. On November 26, 1999, DOC completed a Connecticut Department of Corrections Pre-Service Orientation Performance Appraisal of Plaintiff, indicating her successful completion of the training program. See Connecticut Department of Corrections Pre-Service Orientation Performance Appraisal, completed November 26, 1999. Plaintiff returned to work at OCI after the completion of the DOC training program, in late November or early December of 1999. See Duffy Dep., p. 33.

3.      Denied. Dr. Young was employed by both UCHC and DOC. See also Infra ¶ 6.

4.      Admitted.

5.      Denied. Although Pamela Shea may have had a part in the selection of Plaintiff for the Dental Assistant position at OCI, the Addendum to the Memorandum of Understanding between UCHC and DOC says that "initial and continual employment of staff will be subject to the approval of DOC administration." See Addendum to the

3

Memorandum of Understanding between DOC and UCHC, p. 4. As a result, Plaintiff's application for employment involved, not only interviews with Pamela Shea and Dr. Young, but also a background and security clearance conducted by the DOC. See Duffy Dep., pp. 20-21; Department of Corrections Background Information Sheet, dated July 23, 1999; Connecticut Department of Corrections Release of Information Form, dated July 23, 1999. Plaintiff was not offered employment until after the DOC and UCHC had completed the C.O.L.L.E.C.T. Investigation Report on Plaintiff, noting that she had "met the Department of Corrections minimum standards for the position sought." See C.O.L.L.E.C.T. Investigation Report, dated August 27, 1999.

Although Pamela Shea had supervisory authority over Plaintiff, Dr. Young, as the dentist at OCI, supervised Plaintiff in her daily technical duties. See Defendant's Memorandum of Law, p. 6; Shea Dep., pp. 11-12. Because Plaintiff was a new employee, Dr. Young would advise Plaintiff regarding everything she did, including telling her what time to come to work and what time to leave. See Duffy Dep., p. 34. See supra ¶ 3.

6.   Denied. UCHC shared important employment responsibilities with the DOC. The purpose of the Addendum to the Memorandum of Understanding between the DOC and UCHC was "to enlist the services of UCHC to carry out the responsibility of the commissioner of the DOC for the provision and management of comprehensive medical care." Addendum to the Memorandum of Understanding between DOC and UCHC, p. 1. In the Addendum to the Memorandum of Understanding, DOC and UCHC acknowledged that "the delivery of health care is a joint effort of the DOC and UCHC and can be achieved only through mutual cooperation." See Id., at p. 3. In the Addendum to the Memorandum of Understanding, the DOC and UCHC agreed that "[h]ealth care personnel are subject to the same security regulations as other correctional employees." See Id. On Plaintiff's first day of employment, she received a DOC Employee Handbook and was required to sign a form acknowledging that she understood that she was responsible for reading and understanding its contents and

4

complying with its requirements. See Acknowledgment Form; DOC Employee Handbook. Although the DOC and UCHC agreed that some DOC health care personnel would be transferred to UCHC, the DOC retained "the right to question and/or reject candidates being considered for health care employment at a DOC correctional facility and reserves the right to require the immediate removal of anyone who has broken the rules and/or regulations of the correctional facility or who poses an unacceptable risk to the security of the institution. DOC may require the removal of an individual or firm employed or engaged by UCHC should DOC determine that there is a security risk posed by such individual or firm. Thus, initial and continual employment of staff will be subject to approval of the DOC Administration." Id., at 4. Additionally, the DOC and UCHC agreed that employees would undergo "a security background check and clearance conducted by DOC as a requisite for initial and/or continued employment in accordance with Administrative Directive 2.3 "Employee Selection, Transfer, and Promotion." Id. Furthermore, DOC and UCHC agreed that employees would be required to successfully complete the orientation and training programs required for DOC employees, including the "academy" program at the Department of Corrections Maloney Center for Training and Staff Development, as a condition of employment. See Id.; See also Notice of Department of Correction Training Program, dated September 24, 2003; Duffy Dep., pp. 32-33.

7.     Denied. The letters Plaintiff received should not be categorized as "love" letters. Additionally, Plaintiff's reaction to these letters did not consist merely of bringing the letters to work and reporting them. Rather, Plaintiff suffered fear and anxiety that continues to the present. On or around December 16, 1999, Plaintiff received an anonymous letter, dated December 10, 1999, which had been sent to her father's home address. See Duffy Dep., pp. 37-38; December 10, 1999 letter and envelope. The sender of the letter indicated "I am your secret Admirer." See December 10, 1999 Letter. The letter stated that "I am not the type of person who is following you around, peeking at windows or trying to scare you. Please understand this!!! I have noticed

5

your presence at work." Id. The letter also indicated that "I have your Address but never has seen your house until I am invited." (Sic) Id. The letter ended with a statement that "I am not going to hurt you in any way Please believe me." Id. Plaintiff thought the letter was from an inmate. See Duffy Dep., p. 40. Because Plaintiff worked in a high to medium security prison for male "inmates, murderers," she was scared and mortified when she received this letter. See Young Dep., p. 21; Duffy Dep., pp. 38, 53.

After receiving the December 10, 1999 letter and at the suggestion of a co-worker, Plaintiff reported the incident to a Major in the DOC. See Duffy Dep., pp. 38-39. After reporting the incident to the Major, Plaintiff reported the incident to Pamela Shea. See Id., p. 39. Ms. Shea could see that Plaintiff was frightened by the letter. See Shea Dep., p. 14. Plaintiff told Ms. Shea that she "felt violated, felt scared." See Id., p. 16; Duffy Dep., p. 54. On December 17, 1999, Plaintiff completed a Connecticut Department of Correction Incident Report. See Connecticut Department of Correction Incident Report, dated December 17, 1999.

Shortly after receiving the December 10, 1999 letter, Plaintiff received another anonymous letter, dated December 15, 1999, which had been sent to her father's home address. See Duffy Dep., p. 42; December 15, 1999 letter and envelope. The December 15, 1999 letter stated in part "I catch you once in a while working and I think what a babe! I could spend hours just looking at your eyes and your smile...Arleana, you have a beautiful name and you look very sexy in scrubs. Some day we will meet and have a good laugh. But for now I must look from afar. I wish I could hold you and smell the gentleness of your blonde locks. Someday..... With deep affections and desires, your secret admirer." See December 15, 1999 letter.

The next letter Plaintiff received was an anonymous letter, dated December 16, 1999, postmarked December 18, 1999, and sent to her unpublished home address. See Duffy Dep., p. 43; December 16, 1999 letter and envelope; Major McGill Investigation Report Summary. The December 16, 1999 letter stated in part "I have noticed you while you are working, you look so graceful at what you do." See December 16, 1999 letter. The sender also stated "I mean you no harm and I would

6

love to make you happy as we play this game." Id. The letter also indicated that the sender watching Plaintiff was "not a member of the uniform." Id. The letter also indicated that Plaintiff should contact Mike Young and tell him she received the letter so the sender would know where to send presents. Id.

Around December 20, 1999, after Plaintiff received the December 18, 1999 letter, she was contacted by Dr. Young at work. See Duffy Dep., p. 45-47. Dr. Young told Plaintiff that "Some guy called Northern and asked if you got it yet." See Duffy Dep., p. 46. Plaintiff informed Dr. Young that she had received the letters and was very afraid. See Duffy Dep., p. 46-47. Dr. Young told Plaintiff not to get him involved. See Id. After this discussion, Dr. Young began acting strangely around Plaintiff. He began flying paper airplanes at Plaintiff and avoiding conversations with her. See Duffy Dep., pp. 50-52. Following this conversation with Dr. Young, Plaintiff felt more uneasy because someone had used Dr. Young's name in a letter and contacted him by telephone. See Id., at pp. 52-53.

The final letter Plaintiff received was an anonymous letter, dated December 19, 1999, postmarked December 21, 1999, and sent to her unpublished home address in Springfield, Massachusetts. See Duffy Dep., p. 43-44; December 19, 1999 letter and envelope; Major McGill Investigation Report Summary. Although the previous letters had been postmarked in Hartford, Connecticut, the December 19, 1999 letter was postmarked in Springfield, Massachusetts, indicating that the sender had driven to the city in which Plaintiff lived to mail the letter. See Duffy Dep., p. 43-44; December 19, 1999 letter and envelope. Plaintiff became very concerned when she noticed the postmark. See Duffy Dep., p. 43-44. The December 19, 1999 letter stated in part "Obviously I don't want you to know who I am because that usually ruin (sic) things. You will find out when the time is right. But right now I need to hear what you are thinking or feeling or saying. I trust you will keep this affair a secret." See December 19, 1999 letter. The letter also contained a statement that "I do have desires for you but not in a perverted sense" and that the sender wanted to "if possible share an intimate and overdue kiss. And then we can proceed to whatever we desire." See December 19, 1999 letter.

Plaintiff reported all of these letters to Pamela Shea and a Major at DOC.

Plaintiff also informed Pamela Shea that another woman who worked at Northern, another DOC institution, had received similar letters and notes on her calendar. See Shea Dep., p. 15.

After Plaintiff received the first letter, her work environment never returned to normal. See Duffy Dep., p. 53. Before Dr. Young confessed to sending the letters, Plaintiff was afraid for her life because she worked with inmates, some of whom were convicted murderers. See Id., at pp. 53, 57. After Dr. Young confessed to sending the letters, Plaintiff suffered anxiety because "an employee can take advantage of another employee this way, a supervisor, a doctor, somebody higher up could take advantage of somebody like myself." See Duffy Dep., pp. 67-68. Plaintiff feels that "Nobody protected me. A doctor is allowed to sexually harass, intimidate, stalk two different individuals at two different times and still has his job." "It makes me feel I'm vulnerable, that the people I work for – UCONN doesn't protect their employees, but they're going to go and protect somebody that scared two different individuals and sexually harassed them." See Duffy Dep., p. 76.

8.  Admitted. See Supra ¶ 7.

9.  Denied. Plaintiff received more than two boxes of chocolates. After receiving the letters and informing Dr. Young that she was very scared, Plaintiff received a box of chocolates at her father's address and a box of chocolates at her home address, both containing notes that said, "To: Arleana Just sending a little love to brighten up your day! You are so beautiful. From: your admirer." See Duffy Dep., pp. 48-49; 1-800-FLOWERS Cards. On December 23, 1999, Plaintiff gave the items to Major McGill, who conveyed the items to the Department of Corrections Evidence Storage. See Connecticut Department of Corrections Contraband/Criminal Physical Evidence Tag and Chain of Custody Form.

10.    Denied. After learning of Plaintiff's incident report on December 17, 2002, Major Jeff McGill notified the warden of OCI. See Deposition of Jeff McGill, dated February 8, 2002, hereinafter referred to as "McGill Dep.," pp. 9-10. On December 21, 1999, the OCI Warden, Leslie E. Brooks, authorized Major Jeff McGill to conduct an Administrative Investigation into Plaintiff's December 17, 1999 Incident Report. See December 21, 1999 Memorandum from Warden Brooks to Maj. McGill. Although Pamela Shea recalled attending Dr. Young's interview and asking if he wanted to resign after he admitted sending the letters to Plaintiff, Ms. Shea did not recall any additional participation in the investigation conducted by Major Jeff McGill. See Shea Dep., pp. 16-17. Ms. Shea's independent investigation consisted of asking Dr. Young about the telephone call he allegedly received from the secret admirer. See Shea Dep., pp. 17-18, 27-28.

11.    Denied. Although Plaintiff expressed fear for her safety on December 17, 1999 when notifying the DOC and UCHC of the first letter, Plaintiff was not removed from work until the day before the investigation was ended. See Duffy Dep., pp. 54-56. Plaintiff never requested to be allowed to stay out of work because she believed she was too new to request time off. See Duffy Dep., pp. 54-55. However, Pamela Shea took Plaintiff out of work for one day, right before Christmas, because Ms. Shea was afraid for Plaintiff's safety. See Duffy Dep., pp. 53-54, 56. Ms. Shea believed Dr. Young was sending the letters to Plaintiff and wanted him to be questioned without Plaintiff being at work. See Shea Dep., pp. 19-20. Pamela Shea told Plaintiff "to just go home, and don't come back till this investigation was finished." See Duffy Dep., pp. 53-54, 56. Plaintiff was only out of work for one day. See Duffy Dep., p. 56.

12.    Denied. Other than anonymously sending four letters and two notes containing unwanted comments about Plaintiff's physical appearance, expressions of the sender's sexual desires for Plaintiff, and statements that the sender did not plan to hurt the Plaintiff, to Plaintiff's father's home and her own unlisted home address, knowing that

Plaintiff worked with high to medium security male prisoners, Dr. Young did not further threaten or harass Plaintiff during the time she worked with him. See supra ¶¶ 7, 8, 9. Dr. Young admitted that he had considered that, since Plaintiff worked in a high to medium security prison housing male inmates, she might be afraid that an inmate was stalking her. See Young Dep., pp. 21-22; 31-34. However, Dr. Young did not include any statement in the letters that would have notified Plaintiff that the sender was not an inmate. See Young Dep., pp. 31-34.

13. Admitted. However, Dr. Young repeatedly denied sending the letters until Major Jeff McGill threatened to have a handwriting analysis conducted to prove Dr. Young sent the letters. See McGill Dep., pp. 14-15; See also Wallace notes of Loudermill hearing, dated January 26, 2000.

14. Denied. The DOC and UCHC had access to sufficient information to have made them aware of Dr. Young's previous instances of improper behavior. In 1998, Dr. Young left two anonymous letters for Marjorie Walsh, a DOC Office Assistant, in Ms. Walsh's office. See Young Dep., p. 24. Additionally, Dr. Young wrote several "I ♡ U" notes on Ms. Walsh's desk calendar. Id. On October 15, 1998, Marjorie Walsh filed a Connecticut Department of Corrections Incident Report regarding these anonymous letters. See Walsh Incident Report, dated October 15, 1998. Ms. Walsh reported that on October 5, 1998, one of the letters was on her floor when she arrived to work. See Id. Ms. Walsh reported that a second letter was left on her office floor while she was on a twenty minute break on October 9, 1998. See Id. Ms. Walsh stated that the letters made her feel very uncomfortable. See Id. Lieutenant B. Loubier completed a follow up summary to Ms. Walsh's Incident Report. See Loubier Incident Report, dated October 21, 1998. Although Lieutenant B. Loubier discovered that Ms. Walsh's office was not in direct view of the security camera, he was able to compile a list of personnel who were in the area of Ms. Walsh's office when Ms. Walsh went on her break. See Id. Although Ms. Walsh had indicated that no additional notes had been left for her since

October 9, 1998, Lieutenant B. Loubier stated that he believed that "This person may have knowledge that this incident has been reported and has decided to either discontinue indefinitely or just for the time being." See Id. Lieutenant B. Loubier recommended that a handwriting comparison for any staff who were in the area of Ms. Walsh's office when Ms. Walsh went on her break be performed and that "Affirmative Action be notified of this incident." See Id. Lieutenant B. Loubier attached to his report medical attendance sheets and duty rosters for the days Ms. Walsh received letters. See Id. Dr. Young was present on both days. See Sign In/Out Sheets, dated October 5, 1998 and October 9, 1998. On October 5, 1998, Dr. Young was one of eight employees to arrive before Ms. Walsh. See Sign In/Out Sheets, dated October 5, 1998. On October 9, 1998, the day Ms. Walsh received a letter when she went on break, only seventeen staff members entered the medical unit during the entire day and only eight of those staff members were present during the time the letter was left for Ms. Walsh. See Sign In/Out Sheets, dated October 9, 1998. Additionally, only four staff members were present on both days at the time the letters were left for Ms. Walsh. See Sign In/Out Sheets, dated October 5, 1998 and October 9, 1998. Dr. Young was one of those four individuals. See Id. Despite the fact that Dr. Young had been present on both days during the hours that the letters were left for Ms. Walsh and was undoubtably seen on the security tapes, no one ever interviewed Dr. Young as part of an investigation into these incidents. See Young Dep., p. 24. Additionally, although Lieutenant B. Loubier indicated that he believed that the perpetrator might begin this behavior again, no further investigation appears to have been conducted after Ms. Walsh indicated that she did not wish to pursue the matter. See Loubier Incident Report, dated October 21, 1998.

15.     Denied. Dr. Young confessed to sending the anonymous letters to Plaintiff and Marjorie Walsh on December 22, 1999, Pamela Shea placed Dr. Young on paid administrative leave. See Shea Dep., pp. 16-17; Notice of Administrative Leave, dated December 22, 1999. After the investigation, Dr. Young was given a Loudermill hearing

11

Respectfully submitted,
The Plaintiff, By Her Attorney


_____
Tani E. Sapirstein
Federal Bar No. 21160
Sapirstein & Sapirstein, P.C.
1341 Main Street, 3rd Floor
Springfield, MA 01103
Tel:   (413) 827-7500
Fax:   (413) 827-7797

November 17, 2003


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above document was served upon the following, via first class mail, postage prepaid:

Antoria D. Howard, Esq.
Assistant Attorney General
55 Elm Street
Hartford, CT 06141-0120


_____
Tani E. Sapirstein

Date:  November 17, 2003


J:\WP61\CASEFILE\Duffy\Lit\Statement of facts.wpd

on January 26, 2000.  See Deposition of Karen Duffy Wallace, dated February 8, 2002, hereinafter referred to as "Wallace Dep.," pp. 8-9, 14.  Although Plaintiff and Ms. Walsh were the victims of Dr. Young's harassment, neither was asked to attend the Loudermill hearing.  See Wallace Dep., pp. 10, 25.  Karen Duffy Wallace, the employee who conducted the Loudermill hearing and ultimately decided what discipline should be taken against Dr. Young, never met Plaintiff.  See Wallace Dep., pp. 10, 22, 23, 27-28.  Pamela Shea presented the evidence against Dr. Young at the Loudermill hearing.  See Wallace Dep., p. 11; Shea Dep., pp. 20-21.  Ms. Shea believed that Dr. Young had sexually harassed Plaintiff.  See Shea Dep., p. 30.  Ms. Shea recommended the termination of Dr. Young.  See Wallace Dep., pp. 13, 15; Shea Dep., pp. 22-23, 29-30; Wallace notes of Loudermill hearing, dated January 26, 2000.  At the hearing, Ms. Wallace recorded the reasons given by Ms. Shea in support of terminating Dr. Young.  See Wallace Dep., p. 15; Wallace notes of Loudermill hearing, dated January 26, 2000.  Ms. Shea noted her concern that Dr. Young's behavior had violated stalking laws.  See Shea Dep., p. 30, Wallace notes of Loudermill hearing, dated January 26, 2000.  Ms. Shea believed that Dr. Young should be terminated because his actions were devious, cunning, and precalculated.  See Shea Dep., pp. 22-23; Wallace notes of Loudermill hearing, dated January 26, 2000.  She noted that Dr. Young had changed the fonts in his letters and denied his actions until he was told of all of the proof against him.  See Shea Dep., 23; Wallace notes of Loudermill hearing, dated January 26, 2000.  Ms. Shea noted that Dr. Young had exhibited a pattern of harassment at two facilities.  See Shea Dep., p. 23; Wallace notes of Loudermill hearing, dated January 26, 2000.  Ms. Wallace also recorded that Dr. Young "Took adv[antage] of being a sup[erior] to 2 D[ental] A[ssistant]s."  See Wallace notes of Loudermill hearing, dated January 26, 2000.  Ms. Shea was also concerned that Dr. Young would repeat his behavior.  See Shea Dep., p. 29.

To avoid dismissal, Dr. Young offered to enter into a "Last Chance Agreement."  See Wallace Dep. 27-28.  Although Dr. Young was eventually given a ten (10) day suspension, he was granted over a month of paid leave, from December 22, 1999 until

12

January 28, 2000, as a result of his harassment of Plaintiff. See Young Dep., p. 26; Notice of Administrative Leave, dated December 22, 1999; "Last Chance Agreement." Although Dr. Young was transferred to another facility as part of this "Last Chance Agreement," he was never restricted from entering OCI or any other facility. See Wallace Dep., pp. 33, 35. Furthermore, prior to this purported "disciplinary action," Dr. Young had been assigned to work with maximum (Northern) and maximum to medium (OCI) security adult male prisoners. See Young Dep., p. 21. His "disciplinary" transfer was to Manson Youth Institute, a youth correctional facility. See Young Dep., p. 37; Dental Assignment Memorandum, dated February 8, 2000. Although Dr. Young agreed to go to counseling as part of his "Last Chance Agreement," he only attended two or three sessions with a psychiatrist. See Wallace Dep., pp. 29-20; Young Dep., pp. 26-27. Furthermore, the "Last Chance Agreement" required Dr. Young to utilize a University of Connecticut benefit, the Employee Assistance Program, four times. See "Last Chance Agreement."

16.   Denied. UCHC and the DOC claim that "[i]n deciding the discipline for Dr. Young, UCONN considered many things, i.e. the actual incidents, Dr. Young's prior record, recommendations from co-workers, his attitude and his assurances that the conduct would not occur again." Ms. Wallace, who ultimately decided the discipline to be taken against Dr. Young for his sexual harassment of Plaintiff, testified that she never analyzed whether the letters sent to Plaintiff were sexually harassing. See Wallace Dep., p. 21. Additionally, Ms. Wallace testified that she considered Dr. Young's prior record to be "clean" because, although he had previously engaged in the same type of improper conduct with another employee at another facility, he had never been officially disciplined for that prior improper conduct. See Wallace Dep., p. 24. Although UCHC and the DOC claim that Ms. Wallace considered recommendations from Dr. Young's co-workers, the record shows that she disregarded the recommendations for dismissal made by Dr. Young's supervisor, Pamela Shea. See Shea Dep., pp. 25-26, 34-35. Ms. Shea, who had been present during Dr. Young's

13

confession, had spoken to the investigator and had read all of the investigation reports, expressed to Ms. Wallace her belief that Dr. Young should be terminated. See Shea Dep., pp. 16, 21, 22. Ms. Shea continues to believe that Ms. Wallace's decision not to terminate Dr. Young was a mistake. See Shea Dep., p. 26. Furthermore, neither Plaintiff nor Marjorie Walsh, the employees who were the victims of Dr. Young's harassment, were contacted or asked to participate in the Loudermill hearing. See Wallace Dep., pp. 10, 22-33. When listing all the factors that she allegedly considered, Ms. Wallace never mentioned that she considered the victims of Dr. Young's behavior or whether the discipline would protect Plaintiff, Ms. Walsh, or other female employees from this type of behavior, prevent Dr. Young from having access to Plaintiff and Ms. Walsh, or deter other potential harassers from engaging in harassing conduct. See Wallace Dep., p. 22-33.

17.  Denied. Since Dr. Young was disciplined, Plaintiff has been unable to attend dental staff group events and training sessions because Dr. Young could be in attendance. See Duffy Dep., p. 36; Duffy Affidavit ¶ 1. UCHC and the DOC have failed to warn Plaintiff that Dr. Young will be attending particular work-related events or training, requiring Plaintiff to individually investigate which events or training sessions she must avoid. Duffy Affidavit ¶¶ 2, 3. Furthermore, Plaintiff was forced to get a transfer to another facility because of hostility she encountered from her new supervisor, who was a friend of Dr. Young. Duffy Affidavit ¶ 4. Because Dr. Young remains employed by UCHC and the DOC, Plaintiff's options for transferring to alternative facilities are limited. See Duffy Dep., p. 37; Duffy Affidavit ¶ 5.

### Plaintiff's Statement of Disputed Issues of Material Fact

A.  The DOC and UCHC were both employers of Plaintiff and Dr. Young. See Supra ¶¶ 1, 2, 3, 5, 6, 7, 9, 10, 14.

14

B.  Dr. Young was Plaintiff's immediate supervisor. Dr. Young was the dentist who worked at OCI during the time period from September of 1999 until December of 1999. See Duffy Dep., pp. 29, 33. During Plaintiff's application for employment as a Dental Assistant at OCI, she was interviewed by Dr. Young. See Duffy Dep. 21. During the time periods in 1999 when Plaintiff worked at OCI, Dr. Young was Plaintiff's immediate supervisor. See Duffy Dep., p. 29. The Defendants admit that Dr. Young supervised Plaintiff when she performed dental procedures. See Defendant's Memorandum of Law, p. 6. Because Plaintiff was a new employee, Dr. Young would advise Plaintiff regarding everything she did, including telling her what time to come to work and what time to leave. See Duffy Dep., p. 34. As the dentist supervising Ms. Duffy, Dr. Young would have had input into her performance evaluations and could have recommended that Ms. Duffy be terminated. See Shea Dep., p. 12; See also Duffy Dep., p. 34-35. Additionally, as the dentist at OCI, Dr. Young had the authority to grant or deny requests for sick leave and vacation time. See Duffy Dep., p. 30; Requests for Leave Approved by Young, dated November 5. 1999 and December 1, 1999; See also Shea Dep., pp. 37-38 (noting that Plaintiff's requests for time off had been signed by one of the doctors for whom she currently works).

C.  The harassment Plaintiff suffered was severe and pervasive. See Supra ¶¶ 7, 8, 9, 11, 12.

D.  UCHC and the DOC did not take reasonable steps to prevent the harassment Plaintiff suffered. See Supra ¶¶ 14, 12.

E.  The remedial action taken by UCHC and the DOC was not prompt or adequate. See Supra ¶¶ 11, 12, 14, 15, 16, 17.

15

## LIST OF DOCUMENTS

1. Duffy Dep.
2. Department of Corrections Background Information Sheet, dated July 23, 1999.
3. Connecticut Department of Corrections Release of Information Form, dated July 23, 1999.
4. C.O.L.L.E.C.T. Investigation Report, dated August 27, 1999.
5. Letter of Employment, dated September 7, 1999.
6. Notice of Department of Correction Training Program, dated September 24, 1999.
7. State of Connecticut Designation of Retirement System-Tier-Plan-Beneficiary. Form, signed and dated September 10, 1999.
8. Acknowledgment Form; DOC Employee Handbook.
9. Young Dep.
10. Addendum to the Memorandum of Understanding between DOC and UCHC, dated August 11, 1997, p. 4. On November 26, 1999.
11. Connecticut Department of Corrections Pre-Service Orientation Performance Appraisal, completed November 26, 1999.
12. Shea Dep.
13. December 10, 1999 letter and envelope.
14. Connecticut Department of Correction Incident Report, dated December 17, 1999.
15. December 15, 1999 letter and envelope.
16. December 16, 1999 letter and envelope.
17. Major McGill Investigation Report Summary.
18. December 19, 1999 letter and envelope.
19. 1-800-FLOWERS Cards.
20. Connecticut Department of Corrections Contraband/Criminal Physical Evidence Tag and Chain of Custody Form.
21. McGill Dep.
22. December 21, 1999 Memorandum from Warden Brooks to Maj. McGill.
23. Wallace notes of Loudermill hearing, dated January 26, 2000.
24. Walsh Incident Report, dated October 15, 1998.
25. Loubier Incident Report, dated October 21, 1998.
26. Sign In/Out Sheets, dated October 5, 1998 and October 9, 1998.
27. Notice of Administrative Leave, dated December 22, 1999.
28. Wallace Dep.
29. "Last Chance Agreement."
30. Duffy Affidavit.
31. Requests for Leave Approved by Young, dated November 5. 1999 and December 1, 1999.
32. Dental Assignment dated February 8, 2000.

J:\WP61\CASEFILE\Duffy\Lit\List of Documents.wpd